IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.  5:11CR052 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE LESLEY WELLS |
| v. | ) | |
| | ) | |
| JEFF BOYD LEVENDERIS, | ) | GOVERNMENT'S RESPONSE IN |
| | ) | OPPOSITION TO DEFENDANT'S |
| Defendant. | ) | MOTION TO SUPPRESS |

Now comes the United States of America, by and through its undersigned counsel,

Steven M. Dettelbach, United States Attorney for the Northern District of Ohio, Assistant United

States Attorneys Justin E. Herdman and Thomas E. Getz, and respectfully requests that this

Honorable Court deny, for the reasons set forth in the attached Memorandum, Defendant Jeff

Boyd Levenderis's Motion to Suppress in its entirety.

**MEMORANDUM**

I.    STATEMENT OF FACTS

From approximately 1992 until early November 2010, Jeff Boyd Levenderis (hereinafter, "the Defendant") owned and resided in a house located at 2694 South Main Street in Akron, Ohio.  This property is located within the boundaries of Coventry Township, but has an Akron mailing address.  In the fall of 2010, the Defendant became ill and, through the help of Bob Coffman (hereinafter "Coffman"), a retired police officer, was admitted for emergency care at Summa Akron City Hospital and, soon thereafter, to longer-term rehabilitation care at Essex of Tallmadge.  The Defendant remained at Essex from November 2010 until his arrest in this case on January 28, 2011.

While the Defendant was in the rehabilitation center, Coffman became the effective custodian of 2694 South Main and moved into the home.  During this time period, Coffman began cleaning the home and planned to purchase the property, which was then in foreclosure. Coffman also was granted a power of attorney from the Defendant during this time period.

At the time Coffman was cleaning the house, he frequently visited the Defendant at the rehabilitation center.  During one of these visits, in approximately December 2010, the Defendant stated that he hoped no one took the coffee can that was in the freezer, further explaining that if the can were opened, it could be dangerous.  A few weeks after this discussion, the Defendant told Coffman that the substance inside the coffee can was ricin and if inhaled, could be fatal.  The Defendant further suggested to Coffman that the ricin could be disposed of by either burying it in the backyard or burning it.

On January 24, 2011, Coffman approached the Navy Reserve Center in Akron and, when told that he could not obtain military assistance in disposing of a toxic material, then sought

assistance from the Akron Fire Department.  The Akron Fire Department immediately notified the Akron office of the Federal Bureau of Investigation ("FBI").

The FBI contacted Coffman that same day.  At that time, Coffman signed a "Consent to Search" form relative to a search of 2694 South Main Street in order for the FBI to recover the coffee can from the freezer in the kitchen.  (Exhibit A, Consent to Search Form Signed by Robert C. Coffman) (filed under seal).  Later, Coffman also provided the FBI with the only key to the home and a sketch of the interior of the residence.

On January 24, 2011, FBI agents also interviewed the Defendant at Essex of Tallmadge. (Exhibit B, FBI FD-302 of Interview with Jeff Boyd Levenderis on January 24, 2011) (filed under seal).   During that interview, the Defendant denied that the substance was ricin, instead telling the agents that it was "a very strong type of ant poison" he had manufactured in approximately 2008.  After being advised of the potential criminal consequences of lying to federal agents, the Defendant again claimed the substance was ant poison, and that he was only joking when he told Coffman that the substance was ricin.  The Defendant further described – in substantial detail – the steps he took to manufacture the "poison."  The Defendant stated that the completed substance "looks like cocaine."  He advised the agents that the substance was stored in smaller containers placed inside an "instant coffee type of jar" in the refrigerator or freezer at the Akron residence.  During the interview, the Defendant also consented to the search of two computers, one of which was located inside 2694 South Main Street.  (Exhibit C, Consent to Search Form Signed by Jeffrey Boyd Levenderis) (filed under seal).

The following day – January 25 – specially-trained federal agents from the FBI's Hazardous Materials Operations Unit (based in Quantico, Virginia) conducted the consent search of the Akron residence.  The search was focused on the freezer located in the kitchen of the

residence. The search team recovered a Folgers coffee container from the freezer; inside the container were three prescription pill bottles, each of which contained a powdery substance. Subsequent laboratory testing of the substance in the pill bottles established that the substance was, in fact, the biological toxin ricin.

On January 27, 2011 – subsequent to learning that the substance obtained from the Defendant's home was ricin – FBI agents again visited the Defendant at Essex of Tallmadge. (Exhibit D, FBI FD-302 of First Interview with Jeff Boyd Levenderis on January 27, 2011) (filed under seal). At that time, the Defendant stated that everything he had told the FBI the other day was the truth and "it wasn't ricin." The Defendant then made two phone calls, at the conclusion of which he advised that he wasn't comfortable answering any questions without an attorney present. FBI agents immediately left the Defendant's room.

Later that same day, the Defendant appeared with his attorney and Coffman at the Akron FBI office. (Exhibit E, FBI FD-302 of Second Interview with Jeff Boyd Levenderis on January 27, 2011) (filed under seal) During this interview, the Defendant admitted that he had not been completely honest with agents in his prior discussions. The Defendant admitted to making high-grade "weaponized" ricin, which he had ground down to a fine powder amenable to airborne delivery. The Defendant stated that he manufactured the ricin at the Akron residence approximately ten years earlier, after researching methods of obtaining castor beans on the internet. He then provided interviewing agents with a lengthy description of the anticipated uses to which he would put the ricin and detailed the many steps he took to produce the toxin.

On January 28, 2011, a comprehensive search of the Akron residence was conducted by law enforcement and public safety personnel pursuant to a federal search warrant signed by United States Magistrate Judge William H. Baughman, Jr. Additional items, including several

gas masks and glassware containing residue (later tested negative for ricin) were obtained during this search. The Defendant was arrested on this same date.

II.    LEGAL STANDARD

A.    Search and Seizure

    1.    Consent Searches

A search conducted pursuant to a valid consent is a well-recognized exception to the Fourth Amendment's general warrant requirement. *See Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). Such consent can be granted by either the individual whose property is to be searched, *United States v. Ayoub*, 498 F.3d 532, 537 (6th Cir. 2007)(citing *Schneckloth*, 412 U.S. 218), or "from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Id*. (citing *United States v. Matlock*, 415 U.S. 164, 171 (1974)).

Common authority is not to be implied "from the mere property interest a third party has in the property… but rests on mutual use of the property by persons generally having joint access or control for most purposes." *Matlock*, 415 U.S. at 171, n. 7. "[T]he exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant." *Georgia v. Randolph*, 547 U.S. 103, 109 (2006). Thus, a third party with apparent authority over certain property or premises may validly consent to its search. *Ayoub*, 498 F.3d at 537 ("In other words, a search consented to by a third party without actual authority over the premises is nonetheless valid if the officers reasonably could conclude from the facts available that the third party had apparent authority to consent to the search.") (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)). *See also Matlock*, 415 U.S. at 170; *United States v. Hunyady*, 409 F.3d 297 (6th Cir.

2005) (representative of deceased homeowner's estate had common apparent authority to consent to search).

A co-occupant's or third party's "common authority" is not synonymous with a technical property interest: "[t]he authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes." *Katz v. United States*, 389 U.S. 347, 352-53 (1967). Furthermore,

> When one person consents to a search of property owned by another, the consent is valid if the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises. Thus, there is no violation of the Fourth Amendment if, under the totality of the circumstances, the officer performing the search has relied in good faith on a person's apparent authority.

*United States v. Campbell*, 317 F.3d 597, 608 (6th Cir. 2003) (internal quotation and citations omitted). *See also United States v. Morgan*, 435 F.3d 660 (6th Cir. 2006) (apparent authority is judged objectively and is not vitiated even if later discovered facts undermine its reasonableness).

The facts in *United States v. Ayoub*, 498 F.3d 532, are particularly instructive on the issue of actual and apparent authority to consent. In that case, a search was conducted upon the consent of the property owner's daughter, who was the caretaker of the home while her parents (the property owners) were absent overseas. *Id*., at 536. The Sixth Circuit found that the daughter had actual authority – not merely apparent – to consent to a search of the residence. This finding did not hinge upon the familial relationship, as a "guest's consent may suffice if the host was away from the premises for a significant period of time and had the guest in full charge." *Id*. (quoting 5 Wayne R. LaFave, Search and Seizure, § 8.6 (4th ed. 2004) (internal citations omitted)). The Sixth Circuit also found that the defendant's lack of objection to the

6

search was a relevant factor, *Id*., at 540, as was the sister's lack of deference to the defendant on

the issue of consent.  *Id*., at 541.  Since the Sixth Circuit found that the sister had actual authority

to consent to the search of the home, they did not find it necessary to consider whether she had

apparent authority.  In any event, however, the court held that the "analysis would largely

overlap with the actual-authority analysis because the officers' impressions of the facts largely

coincided with the objective facts."  *Id*.

      2.    <u>Exigent Circumstances</u>

To justify a warrantless entry and search on the basis of "exigent circumstances," the

government must demonstrate that three factors existed: (1) a need for immediate action that

would have been defeated if law enforcement had taken time to secure a warrant; (2) sufficiently

important governmental interest being served by the warrantless entry; and (3) that weighing the

governmental interest against the defendant's interest in the privacy of his home, the defendant's

conduct somehow diminished that right.  *United States v. Rohrig*, 98 F.3d 1506, 1518 (6th Cir.

1996).  Exigent circumstances supporting a warrantless entry fall under one of four general

categories: (1) hot pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) prevention

of a suspect's escape; and (4) a risk of danger to law enforcement or the public.  *Id*. at 1515;

*United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994).

To justify an entry based on exigent circumstances where the safety of police or the

general public may be jeopardized, the facts must show that the threat to the officers or the

public was "immediate."  Such facts are often demonstrated by the presence of explosives or

other dangerous materials.  *See United States v. Johnson*, 9 F.3d 506, 510 (6th Cir. 1993)

(warrantless search valid where presence of explosives on premises presented genuine threat to

public safety); *United States v. Lindsey*, 877 F.2d 777, 781 (9th Cir. 1989) ("Exigent

circumstances are frequently found when dangerous explosives are involved.").

In *United States v. Urban*, 710 F.2d 276 (6th Cir. 1983), the Sixth Circuit considered an

exigent circumstances entry by police and federal law enforcement in responding to the scene of

a late-night house fire.  Although the home was inspected that night and numerous explosive

materials were found therein, the hazardous materials were not removed until the next morning

for several reasons, including "the lack of proper removal equipment."  *Urban*, 710 F.2d at 277.

Neither the night entry nor the entry made early the next morning were performed under search

warrant authority.  *Id.*  The "render safe" operation was deemed "eminently reasonable… thus,

the warrantless entry by [law enforcement] was justified as a continuing response to the exigency

created…" *Id.*, at 279 (citing *Michigan v. Tyler*, 436 U.S. 499, 510 (1978).

B.     Statements to Law Enforcement

1.     The Miranda Decision and the Paramount Importance of Custody

*Miranda* warnings are required when a subject is interrogated either in custody or its

functional equivalent. *Miranda v. Arizona*, 384 U.S. 436 (1966).  The test for custody is whether

the suspect has been deprived of "freedom of action in any significant way." *Id.* at 444.  This has

been further defined by the Supreme Court as to whether there was a "formal arrest or restraint

on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*,

463 U.S. 1121, 1125 (1983) (per curiam) (internal quotation and citation omitted).  In

determining custody, the "only relevant inquiry is how a reasonable man in the suspect's position

would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

The Sixth Circuit examines the totality of the circumstances in determining how a

reasonable person would have understood the situation.  Relevant factors in making such a

determination include: (1) whether a reasonable person in the defendant's position would feel free to leave; (2) the purpose of the questioning; (3) the location of the questioning; (4) the length of the questioning; and (5) any other indicia of custody, such as whether the defendant was informed that the questioning was voluntary, whether the defendant was subjected to any restraint on freedom of movement, and whether the defendant initiated contact with the authorities.  *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003); *see also United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998).

The Sixth Circuit has "explicitly recognized that *Miranda* warnings are not required simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect."  *Beheler*, 463 U.S. at 1125 (internal quotation and citation omitted).  *See also Mason v. Mitchell*, 320 F.3d 604, 631-32 (6th Cir. 2003) (defendant, the sole suspect in the investigation, who voluntarily came to the police station for questioning and was repeatedly told he was free to leave, was not in custody for purposes of *Miranda*); *United States v. Sivils*, 960 F.2d 587, 597-98 (6th Cir. 1992) (defendant not "in custody" during interview at police station where he was told he was not under arrest, was free to move about and to make phone calls).

Moreover, the fact that a defendant may be hospitalized does not create "custody" where the restraint on liberty is created by the hospital or the defendant's condition – not the police.  *See*, *e.g.*, *United States v. New*, 491 F.3d 369 (8th Cir. 2007).  In *New*, the defendant was confined to his hospital bed and under medication as a result of a motor vehicle accident.  On appeal, the Court concluded that the defendant was not in custody for *Miranda* purposes when FBI agents interviewed him in his hospital room, as the agent told the defendant he did not have to talk, and that he could stop the interview at any time.  Moreover, the agent never used force,

9

the defendant never sought to terminate the interview, and there was no indication that the

defendant was so intoxicated by medication that he did not understand his rights. *See also*

*United States v. Martin*, 781 F.2d 671 (9th Cir. 1986) (hospitalized defendant not in custody for

*Miranda* purposes - defendant had gone to hospital before officers arrived at apartment, and

officers did nothing to bring about or extend his hospitalization); *United States v. Jamison*, 509

F.3d 623 (4th Cir. 2007) (emergency room; restraint on defendant's liberty was a product of the

medical problems he created by shooting himself).

In sum, the Sixth Circuit has consistently held that *Miranda* warnings are not required

before an interrogation when the individual is not "in custody." *United States v. Warner*, 971

F.2d 1189, 1201 (6th Cir. 1992). *See*, *e.g*., *United States v. Crossley*, 224 F.3d 847 (6th Cir.

2000) (*Miranda* warnings not required in context of consensual workplace interview in unlocked

classroom); *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (one and one-half hour

workplace interview in unlocked conference room not custodial interrogation); *United States v.

Peete*, 919 F.2d 1168, 1177 (6th Cir. 1990) (*Miranda* "only applies to situations involving

custodial interrogations"); *United States v. Macklin*, 900 F.2d 948, 950-51 (6th Cir. 1990) ("A

person is entitled to receive *Miranda* warnings only if questioned while in custody.").

    2.   Involuntariness

"[E]ven if *Miranda* warnings are not required, a confession cannot be used if it is

involuntary." *Macklin*, 900 F.2d at 951. To support a finding that a statement was unlawfully

coerced, the evidence must establish that (1) the police activity was objectively coercive; (2) the

coercion in question was sufficient to overbear the defendant's will; and (3) the alleged police

misconduct was the crucial motivating factor in the defendant's decision to offer the statement.

*United States v. Mahan*, *supra*, 190 F.3d at 422 (*citing McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988)).

In determining whether a defendant's will was overborne in a particular case, the court examines the "totality of the circumstances." *Mahan*, 190 F.3d at 422. Relevant factors may include "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health," as well as whether the defendant had been informed of his constitutional rights, and the existence of police coercion. *United States v. Williams*, 612 F.3d 417 (6th Cir.), *cert. denied*, 131 S. Ct. 614 (2010).

Even an affirmative misrepresentation by law enforcement does not, by itself, render a confession involuntary. *Colorado v. Connelly*, 479 U.S. 157, 164 n.2 (1986) ("Even where there is causal connection between police misconduct and a defendant's confession, it does not automatically follow that there has been a violation of the Due Process Clause.") (citation omitted). Moreover, merely informing a suspect of the penalties for the crime being investigated or warning of potential criminal charges does not make any subsequent statement involuntary. *See, e.g.*, *Simpson v. Jackson*, 615 F.3d 421 (6th Cir. 2010); *McCalvin v. Yukins*, 444 F.3d 713 (6th Cir. 2006); *Mahan*, 190 F.3d at 423 (agent's statement to defendant that he could get into serious trouble for providing false information "falls short of the police coercion required to render a defendant's statement involuntary").

Likewise, mental disability, hospitalization, or the fact that a defendant may be in great pain or under the influence of medication do not necessarily translate to involuntariness. *See, e.g.*, *New*, *supra*, 491 F.3d at 369 (defendant's statements during hospital room interview were voluntary; although defendant was confined to bed and under medication, there was no coercive activity by law enforcement that overbore defendant's will or impaired his capacity for self-

11

determination); *Macklin*, 900 F.2d at 951-52 (confession of mentally retarded defendants voluntary where there was no coercive police activity and defendants understood the consequences of their actions); *United States v. Newman*, 889 F.2d 88, 94-95 (6th Cir. 1989) (absent any misconduct on the part of FBI agents interrogating defendant, his mental impairment as a result of alcoholism was insufficient to establish that the statements were involuntary); *Martin*, 781 F.2d at 674 (fact that defendant was hospitalized, in pain, and under influence of medication during questioning did not render statements to police involuntary; defendant was awake, "relatively coherent," had not received excessive quantities or unusual combinations of drugs, and had shown willingness to speak to law enforcement); *McCall*, 863 F.2d at 459 (confession voluntary where although defendant was in an injured state when arrested/questioned, his condition was not a result of police action); *Connelly*, 479 U.S. at 164 (mental capacity only one factor in establishing involuntariness; coercion must also be shown).

III.     ARGUMENT

A.     The Search of the Property and Computers Was Valid

The January 25, 2011 searches of the Akron residence and seizure of the Defendant's computers were valid. The voluntary consent to search by both Coffman and the Defendant acted as a waiver to the requirement that a warrant be obtained. *See Schneckloth*, 412 U.S. at 235. Even if Coffman did not have actual authority to consent to the search of the residence – and all evidence suggests that he must have had such authority – law enforcement officers relied on Coffman's apparent authority, based on the representations of both Coffman and the Defendant, to obtain valid consent to search. Finally, even if no such apparent authority existed, law enforcement officers were still entitled to enter the residence to seize the substance identified

as ricin based on exigent circumstances, due to the extremely hazardous nature of the toxin and

the threat to public safety.

      1.      <u>The January 25, 2011 Search of 2694 South Main Street Was Valid</u>

    With respect to 2694 South Main Street, the FBI obtained valid consent from Coffman to

search the residence, as Coffman signed a Consent to Search form on January 24, 2011.  The

consent form executed by Coffman clearly stated he had been advised of his right to refuse to

consent to a search and that his consent was given voluntarily.

    There can be no serious question as to Coffman's actual authority to consent to this

search.  As noted above, the Defendant was in a long-term rehabilitation center in Tallmadge,

Ohio.  The Defendant had not been present inside 2694 South Main Street since November 1,

2010 – nearly three full months of absence.  In his stead, Coffman had been the effective

caretaker, custodian, and resident of 2694 South Main Street.  At the time he gave consent to

search the home, Coffman was currently occupying the residence and making improvements to

the property.  In addition, Coffman was in the process of purchasing the residence on a short sale

from the bank.  Coffman also possessed the only key to the residence.  Nor did Coffman ever

defer the issue of consent to the Defendant; clearly, Coffman believed that actual authority to

consent to the search rested with him alone.  As further demonstration of his familiarity with the

residence, Coffman sketched a diagram of the home for the FBI and indicated the precise

location of the freezer containing the coffee canister filled with ricin.  Indeed, if Coffman did not

have actual authority to consent to the search of 2694 South Main Street, then likely nobody did.

    Of critical importance in the analysis of this valid consent to search, the Defendant

himself did not object to any proposed search of 2694 South Main Street.  To the contrary, he

executed a Consent to Search form on January 24 for a computer located inside that very

residence.  The Defendant even went so far as to direct agents as to the exact location of that computer, as well.  This form indicated that the Defendant had "been advised of my right to refuse to consent of this search," yet gave permission for this search "freely and voluntarily." Certainly were the Defendant of a mind to prevent such a search from occurring, this interaction with agents would have triggered such a response.  Yet no objection was forthcoming; instead, the agents were told they were "welcome to search" the Defendant's computers, including the one located within 2694 South Main Street.

Even if Coffman were not found to possess actual authority to consent to the search – and again, such a finding is contrary to all the evidence – the FBI was still entitled to rely "in good faith on a person's apparent authority." *See Campbell*, 317 F.3d at 608.  All indications to law enforcement were that Coffman clearly controlled and had authority over the property.  At the time Coffman consented to the search, the Defendant had not been living at the residence for nearly three months.  Coffman had a key to the residence, was living there and making improvements.  Coffman also stated that he had power of attorney for Defendant and never deferred to the Defendant on the issue of consent.  In essence, no one with a reasonable expectation of privacy (other than Coffman) was present and objected to the consent search, including the Defendant.

Regardless of whether valid consent to search was obtained, the search would still be justified based on exigent circumstances, as there was an imminent risk of danger to law enforcement and the general public.  On January 24, 2011, the FBI was in possession of two pertinent facts demonstrating exigent circumstances: 1) some amount of a substance, purported to be ricin, was located at 2694 South Main Street; and 2) Coffman was attempting to dispose of

this substance.  These two facts alone provided adequate justification for the FBI to enter the home and seize the substance under exigent circumstances.

As noted above, Coffman had approached the Akron Fire Department on January 24, 2011, with an inquiry regarding disposal methods for ricin.  Naturally, the Akron Fire Department contacted the FBI.  The FBI soon learned that Coffman was in fact seeking to dispose of an undetermined amount of ricin, which was stored in a freezer in the kitchen of the residence.  Additionally, the FBI learned that Coffman had actually handled the container in which the ricin was stored.

As a result, FBI agents and local authorities plainly faced the necessity of taking immediate action to neutralize a potentially volatile situation.  The danger of a private citizen handling and attempting to dispose of ricin – a biological toxin deadly even in tiny amounts – cannot be minimized.  Protective clothing, eyewear, and a respirator or other breathing apparatus are typically utilized by specially trained Hazardous Materials (HAZMAT) Units when handling ricin.  (Exhibit F, CDC Emergency Response Card: Ricin).  These requirements explain the need for a special FBI unit to travel overnight to Akron in order to implement the search on January 25.  Much like in *Urban*, *supra*, 710 F.2d at 279, this "render safe" operation should be deemed "eminently reasonable."

Moreover, improper handling or disposal of the ricin would not only put the handler at risk, but the surrounding community as well.  The Akron residence was by no means isolated; it was situated in a residential community, and improper handling of the ricin would have potentially put any neighbors at risk of exposure as well.  Furthermore, at the time prior to the search, law enforcement was unsure as to the actual amount or potency of the ricin.  Through

inhalation or ingestion, ricin can be fatal at small amounts; it also has the potential to contaminate air, water, and food.  (Exhibit F).

Finally, it should be reiterated that the January 25, 2011 search focused primarily on the freezer in the kitchen area of the residence.  During this search, the only item removed was the coffee can containing the three vials of ricin, obtained from the freezer.  Thus, the limited scope of this search dovetails with the limited purposes of a search justified by exigent circumstances.

The January 25 search of 2694 South Main Street was lawful, based on valid consent from Coffman, who was the only person with actual authority to grant such consent on that date.  Even if Coffman did not have actual authority to consent, the consent obtained was still valid based upon Coffman's apparent authority.  Finally, regardless of whether consent was valid, law enforcement's entry into the home to seize the ricin was justified by the exigent circumstances posed by the hazardous nature of the toxin and the extreme threat it posed to the public.

2.    <u>The Seizure of the Defendant's Computers Was Valid</u>

In the present matter, law enforcement authorities obtained signed Consent to Search Forms for both computers identified by the Defendant – a black IBM laptop located at 2694 South Main Street and a Mac desktop in the possession of Coffman's brother.[1]  Specifically, during the January 24, 2011 interview in Defendant's nursing home room, the Defendant indicated that the FBI was "welcome to search" his computers, and subsequently signed two Consent to Search Computer(s) forms.  The written consent forms executed by Defendant clearly stated he was advised of his right to refuse to consent to a search.  The executed consent forms also stated that Defendant had not been threatened, and that his consent authorizing the FBI to search his computers was given freely and voluntarily.  Given these forms and the Defendant's

---

[1] The black IBM laptop computer was not actually seized until execution of the federal search warrant on January 28, 2011.  As such, the Defendant's consent to search this computer, while still valid, is presumably not at issue based on his motion's failure to challenge the legality of the search warrant.

statements made at the time, the subsequent seizure of the Mac desktop was obtained under

lawful consent by the Defendant.

B.      The Defendant's Statements Were Not the Product of Custodial Interrogation and Were
        Made Voluntarily

        1.      The Defendant's Statements Were Not the Product of Custodial Interrogation

        The statements made by the Defendant were not the product of custodial interrogation

and were made voluntarily.  The Defendant has apparently based this claim upon the assertion

that he "had no real ability to leave, was pursued on several occasions by agents, had a myriad of

ongoing serious health problems, was always the target of the investigation and was never

considered a witness, was questioned repeatedly on substantive issues as well as to the credibility

of his previous statements, and was suffering from real cognitive impairments."  (R.35: 10/18/11

Motion to Suppress, p. 4).

        At no time during his questioning by the FBI was the Defendant subjected to either

"formal arrest or restraint on freedom of movement of the degree associated with a formal

arrest."  *Beheler*, 463 U.S. at 1125.  Instead, the first two interviews were held in the Defendant's

private room in a nursing home, where the Defendant was free and able to leave at any time.

The third interview was held at the Akron office of the FBI – an interview to which the

Defendant reported voluntarily – with an attorney, no less – and without complaint.

        In support of his argument, the Defendant cites a non-exhaustive list of circumstances in

which hospitalization could constitute custody: "[i]f the police took a criminal suspect to the

hospital from the scene of the crime, monitored the patient's stay, stationed themselves outside

the door, arranged an extended treatment schedule with the doctors, or some combination of

these, law enforcement restraint amounting to custody *could* result."  *Martin*, 781 F.2d at 673

(emphasis added).  However, none of these circumstances apply to the instant case.  Law

enforcement did nothing to bring about or extend the Defendant's hospitalization; the Defendant had been living at the nursing home for almost three months prior to his first coming to the attention of the FBI.  Agents investigating the matter did not station themselves at the hospital (let alone outside the Defendant's door), nor did they have any contact with the Defendant's physicians regarding his treatment.  Indeed, the atmosphere in the Defendant's hospital room could hardly be described as "police dominated."  *See New*, 491 F.3d at 374.  In fact, the Defendant felt so comfortable during these interviews that he freely (and adamantly) made false statements regarding the nature of the substance.  He also was free to make numerous telephone calls (at least one to an individual presumed to be his attorney) in the presence of agents and, ultimately, to request that questioning cease.

Whether the FBI harbored some suspicion regarding the Defendant's statements or considered him a target of the investigation is of absolutely no moment in determining the issue of custody.  The mere fact that the Defendant "was always the target of the investigation and was never considered a witness" by no means "trigger[ed] the need for *Miranda* warnings in [this] noncustodial setting[ ]."  *Minnesota v. Murphy*, 465 U.S.420, 431 (1984) (citing *Beckwith v. United States,* 425 U.S. 341 (1976)).

In short, the Defendant's residence at a rehabilitation facility is a far cry from hospitalization.  Nothing in the Defendant's statements or actions provides any support that he believed himself to be in custody.  Rather, he fully controlled the information relayed to agents, including repeated false assertions about the true nature of the substance in his freezer, and ceased the second interview at a time of his choosing.  The Defendant was not in custody for the purposes of these interviews; as a result, no *Miranda* warnings were required to be given.

18

2.       The Defendant's Statements Were Made Voluntarily and Free from Coercion

Having established that the Defendant's statements were made in a non-custodial setting,

the Court should next conclude that all three statements were made voluntarily.  The Defendant

contends that the same circumstances which are relevant to the custody issue also establish that

the questioning occurred "under circumstances which cannot support a finding of voluntariness."

(R.35: 10/18/11 Motion to Suppress, p. 5).

There is no evidence of any objectively coercive government activity in this case, as

required under *Mahan*.  Indeed, the fact that the Defendant was suffering from health problems

cannot, in and of itself, render his statements involuntary.  His initial hospitalization and

subsequent transfer to the nursing home were not the result of police action.  *See*, *e.g.*, *McCall*,

863 F.2d at 459.  Moreover, as noted above, the Sixth Circuit fully endorses the proposition that

being hospitalized, under the influence of drugs, or any other mental factor, is not a basis for

suppression of the Defendant's statement absent a finding of police misconduct.  Indeed,

"[e]vidence that a defendant suffered, at the relevant time, from a condition or deficiency that

impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the

conclusion that his confession was involuntary for purposes of due process; some element of

police coercion is always necessary."  *Newman*, 889 F.2d at 94.  Furthermore, the fact that the

Defendant was aware that he was considered a suspect or was alerted to the seriousness of the

investigation does not necessarily make his statements involuntary.  Indeed, the Sixth Circuit is

"not prepared to forbid police from conveying to suspects the seriousness of the crime for which

they are being investigated."  *McCalvin*, 444 F.3d at 721.

The Defendant's statements were clearly made voluntarily.  First, the Defendant was

awake, alert, and coherent during questioning; he was not in a drugged or hallucinogenic state,

and he never lost consciousness.  In fact, the Defendant spoke freely and clearly to the agents during the two interviews at Essex of Tallmadge and the interview at the Akron FBI office.  As stated above, the Defendant was in such full control of his faculties that he easily and repeatedly made false statements to cover his own criminal acts.  Moreover, during the January 27, 2011 interview at the nursing home, FBI agents immediately ceased questioning and left after the Defendant made two phone calls, one to his presumed attorney, and stated that he no longer wished to continue without the presence of an attorney.  Second, the length and extent of the questioning was not harsh or undue.  No record exists of any complaint registered by the Defendant as to the length of the questioning or the manner in which the interview proceeded.  Moreover, there is no evidence of any physical punishment, such as food or sleep deprivation.  The location of the interviews – the Defendant's private room in a nursing home and the Akron FBI office – does not lend itself to any coercive effect, especially where he attended the interview at the FBI office with an attorney.  The Defendant was voluntarily staying at the nursing home and was free to leave if he so desired.  Finally, there is no evidence of any promises made to induce the Defendant's statements.

Having unsuccessfully indentified any police misconduct, or any effect that such coercion may have had in overbearing the Defendant's will, the third prong of the *Mahan* test consequently fails as well.  As such, the Defendant's statements were made voluntarily and free of any coercive government action.  Indeed, they were "the product of an essentially free and unconstrained choice by [their] maker."  *New*, 491 F.3d at 374 (quoting *Schneckloth v. Bustamonte*, *supra*, 412 U.S. at 225).

IV.     <u>CONCLUSION</u>

Wherefore, for the reasons cited above, Defendant's Motion to Suppress should be denied in its entirety.


                              Respectfully submitted,
                              STEVEN M. DETTELBACH
                              United States Attorney

                    By:     <u>/s/Justin E. Herdman</u>
                              Justin E. Herdman
                              Assistant U.S. Attorney
                              Reg. No. 0080418
                              400 United States Courthouse
                              801 West Superior Avenue
                              Cleveland, Ohio  44113
                              Tel. No.:  (216) 622-3965
                              Fax No.:  (216) 685-2378
                              E-mail:   justin.herdman@usdoj.gov

                    By:     <u>/s/Thomas E. Getz</u>
                              Thomas E. Getz
                              Assistant U.S. Attorney
                              Reg. No. 0039786
                              400 United States Courthouse
                              801 West Superior Avenue
                              Cleveland, Ohio  44113
                              Tel. No.:  (216) 622-3840
                              Fax No.:  (216) 683-2378
                              E-mail:   thomas.getz@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 3rd day of November, 2011, a copy of the foregoing Government's Response in Opposition to Defendant's Motion to Suppress was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail.  Parties may access this filing through the Court's system

/s/ Justin E. Herdman
Justin E. Herdman
Assistant U. S. Attorney